## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )   Civil Action No.  CV-05-S-095-M |
| | ) |
| DAWSON DEVELOPMENT | ) |
| COMPANY, LLC; MILBURN | ) |
| LONG; | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION

The United States instituted this action for the purpose of enforcing the anti-discrimination provisions of the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.* Accordingly, the court's jurisdiction is based upon a federal question. *See* 28 U.S.C. § 1331.

Park Place Apartments is an apartment complex located in Boaz, Alabama, and it is owned and operated by Dawson Development Company, LLC.[1]  Defendant Milburn Long was the resident manager of, and leasing agent for all units within, Park Place Apartments during all periods relevant to this suit.  The government

---

[1] The government commenced this action on January 18, 2005, asserting claims against both Milburn Long and Dawson Development Company, LLC, and the defendant discussed hereafter, Milburn Long. *See* doc. no. 1.  The government and Dawson Development successfully settled their dispute before trial. *See* doc. nos. 16-17.

contends that Long discriminated against prospective tenants and government testers who were African American.  Long denies that charge.  The issue thus joined was tried to the court, sitting without a jury.

### PART ONE

*Finding of Facts*

Milburn Long is a white male who was 64 years of age on the date of trial.[2]  He previously had been employed by the Goodyear Tire and Rubber Company for about two decades, beginning in 1967, but a back injury forced him to leave that job.[3]  He thereafter worked in the real estate business, from approximately 1990 to 2000.[4]

Long began his employment as resident manager of Dawson Development Company's Park Place Apartments in January 2003.[5]  He worked long hours, sometime from eight in the morning until midnight.[6]   There were forty-eight apartment units in the complex, and each was similar in size and configuration:  *i.e.*, approximately 1,050 square feet, encompassing two bedrooms, two bathrooms, a den, kitchen, and utility room.[7]  Long lived on the premises, and occupied unit number

---

[2] *See* Trial Transcript, at 126.

[3] *See* government's trial Ex. 13, Milburn Long's response to interrogatory 10.

[4] *See* Trial Transcript, at 124-25.

[5] *See id.* at 127.

[6] *See id.* at 140.

[7] *See, e.g.,* government's Ex. 2A, Barry Briggs recording, at minute marks 24:44, 40:24, and 45:20. (*See also* government's Transcript of Briggs recording, at 6, 17, and 23).

"1."

The government began "testing" Park Place Apartment's compliance with the requirements of the Fair Housing Act in April of 2003, just three months after Long became resident manager.  "Testing" is a term used to describe the methods employed by government agents to ferret out discriminatory housing practices.  *See, e.g., United States v. Balistrieri*, 981 F.2d 916, 924 (2d Cir. 1992).  In each "test," the government sends either two "matched" individuals, or two "matched" couples,  one white and one African American, to an apartment complex, posing as prospective tenants.  The matched individuals or couples are similar in all distinguishing characteristics except race.  For example, the testers are the same gender, of similar age and income, and they inquire about the same type of housing.[8]  The government then looks for differences in the leasing agent's response to the testers — for example, quoting higher prices to an African American tester — as indicia of discrimination.  In the tests conducted at Park Place Apartments, the testers were equipped with hidden recording devices to capture their conversations with Milburn Long.

**A.**    *Francine Allen and Aleithea Williams — April 2003*

The government sent its first testers to Park Place in April of 2003.  Francine Allen, who is African American, visited the complex on April 22 at approximately

---

[8] *See* Trial Transcript, testimony of Barbara Spooner, at 78.

1:15 p.m.  She was greeted by Milburn Long.[9]  When Allen asked whether any two-bedroom apartments were available, Long said there were no vacancies, but he did have a waiting list.[10]  Allen put her name and contact information on the waiting list, and said she needed an apartment by mid-May or June.[11]  Long also told Ms. Allen that she could have a rental application if she wanted one.[12]  Long said there was no urgency in completing the written application, however.  In his words, "You could do that now or you could take it with you, whatever.  It doesn't matter."[13]  Long also asked Allen where she worked.  Allen said she had a consulting business, and her husband would be working at Snead State Community College, located in Boaz, Alabama.[14]

Aleithea Williams, who is white, visited Park Place Apartment later the same day, at approximately 3:05 p.m.  She also was greeted by Milburn Long.[15]  Williams said she was looking for an apartment, and she needed it by the same date specified

---

[9] *See* government's Ex. 1A, Francine Allen recording, at minute marks 5:22 and 7:41.  (*See also* government's Transcript of recording, at 2).

[10] *See id.* at 7:50.  (TR at 2).

[11] *See id.* at 23:40 through 24:50.  (TR at 28-29).

[12] *Id.* at 10:40.  (TR at 7).

[13] *Id.* at 11:30.  (TR at 8).

[14] *See id.* at minute marks 16:10 and 28:52.  (TR at 16 and 36).

[15] *See* government's trial Ex. 1B, Aleithea Williams recording, at minute marks 10:35 and 13:54.  (*See also* government's Transcript of recording, at 2).

by her African-American counterpart:   mid-May or June.[16]   Long responded that

there were no vacancies,[17] but he offered to give her a rental application,[18] and said

he had a waiting list.[19]   Long told Williams that she could take the rental application

home with her, complete it, and return it by facsimile.[20]   Long said that, once he

received the application, he would put her name on the waiting list.[21]   Long also

asked Williams where she worked.   Williams said she was not working, but her

husband would soon begin a management position at a Red Lobster restaurant located

in Gadsden, Alabama.[22]   Williams also mentioned that she and her husband were

moving from Maryland.   That prompted Long to offer some advice about other

housing options in nearby areas.[23]   He advised her to avoid one apartment complex

in particular, located next to Gadsden State Community College, in Gadsden,

Alabama:

> LONG:  It's right off 759, across from [the] Gadsden Mall.  It's not a
> bad thing, but when you get all these college kids when you get mixed
> nationalities from everywhere, not that they're bad people, but some of

---

[16] *See id.* 20:35.  (TR at 3).

[17] *See id.* at 20:33.  (TR at 2).

[18] *See id.* at 24:50.  (TR at 8).

[19] *See id.* at 27:45.  (TR at 11).

[20] *See id.* at 1:05:00 (TR at 46) and 1:08:08 (TR at 50).

[21] *See* government's trial Ex. 1B, Aleithea Williams recording, at minute mark 1:08:08.  (*See also* government's Transcript of recording, at 50).

[22] *See id.* at 21:20.  (TR at 4).

[23] *See id.* beginning at 51:10.  (TR at 33).

them when you get together, that's where the crime rate is.  It's more problems.  They've got police there every day.  It might not be as bad as it sounds, but it's not as good as the other ones.  It's something — of course, you don't have children that are going to be around it, but

WILLIAMS:  Not yet, but hopefully, you know.

LONG:  You've got a lot of party people there, a lot of young college people there, and I'm not against blacks.  I'm not, I don't discriminate. You've got blacks, Mexicans, every nationality you know of there.  And it seems like that's the problem areas.  It's not got a good reputation. And at one time they hired a new manager and they come in and kicked out half the people there and started over again and it improved it.[24]

Approximately two weeks later, on May 7, 2003, Milburn Long left a voice mail message for Williams.[25]  Long said Williams' name was on his waiting list, and that an apartment was available for rent.  Long left two telephone numbers where he could be reached.[26]  There is no evidence that Milburn Long ever attempted to contact Francine Allen, the African American tester.

**B.**     *The Bothwells — Spring or Early Summer 2003 to September 2003*

Beverly and Rosemary Bothwell are sisters.  Beverly Bothwell's daughter is named Miesha, and Rosemary Bothwell's daughter is named Sheneka.[27]  All four individuals are African American and, unlike the other persons involved in this case,

---

[24] *Id.* beginning at 59:53.  (TR at 42).

[25] *See* government's trial Ex. 1E, recording of Long's voice mail message, left on Wednesday, May 7, 2003.  *See also* Ex. 6.

[26] *See id.*

[27] *See*, *e.g.*, Trial Transcript, at 18.

they were *bona fide*, prospective tenants.  The daughters graduated from high school in the Spring of 2003, and both planned to attend Snead State Community College, located in Boaz, in the Fall.[28]  Miesha had received an academic scholarship to attend Snead, and Sheneka had received a basketball scholarship.[29]  The cousins agreed to share an apartment on or near campus.[30]

The Bothwells visited Park Place sometime between April and June of 2003.[31] When the Bothwells introduced themselves to Milburn Long, he immediately recognized the surname "Bothwell," and recalled that he once had worked with Rosemary Bothwell's former-husband at the Goodyear Tire plant.  Rosemary Bothwell testified:

> he would start talking to me about my ex-husband when he realized the name of Bothwell.  And he asked me about, you know, we lived in Gadsden.  And he said he used to work at Goodyear.  And I said, "yeah, my ex-husband used to work at Goodyear."  And we started a conversation about it, because he used to work there as well.  And so that's how I know him more . . . .[32]

When the Bothwells inquired about apartment availability, Long said no units were immediately available for rent.[33]  Long put Beverly and Rosemary Bothwell's

---

[28] *See, e.g., id.* at 31.

[29] *See id.* at 53.

[30] *See id.*

[31] *See* Trial Transcript at 17, 50, 55.

[32] *Id.* at 54.

[33] *See id.* at 19.

names on his waiting list,[34] however, and Beverly Bothwell completed a rental application.[35]   The Bothwells then viewed an apartment unit that was rented but temporarily unoccupied.[36]   Rosemary Bothwell recalled that, during their tour of the premises, Milburn Long "was real nice, friendly."[37]   Beverly, Miesha, and Sheneka Bothwell also recalled that Long was friendly.[38]

Beverly Bothwell testified that, after their visit, she telephoned Milburn Long once or twice a week, for two to three weeks.[39]   Rosemary Bothwell also testified that she called "several times" during the summer,[40] but Long continued to represent that no units were available.[41]   According to Long, however, he was doing everything he could to rent an apartment to the Bothwells.

### 1.   *Paige Dawson*

Long testified that when a prospective tenant visited Park Place, he interviewed the person , and if he were satisfied with the interview, he would send the person's written application to "the Dawsons" for approval.[42]   Long testified that "the

---

[34] *See id.* at 19-20, 55.

[35] *See id.* at 20.

[36] *See id.* at 54.

[37] Trial Transcript, at 62.

[38] *See id.* at 27, 40, and 49.

[39] *See id.* at 20-21.

[40] *See id.* at 56, 63.

[41] *See id.* at 63.

[42] *See id.* at 161.

Dawsons" — and Paige Dawson in particular — made the final decision to accept

or reject a rental application.[43]

---

[43] *See* Trial Transcript, at 166-67.  These assertions are disputed.  Paige Dawson testified that Milburn Long, in his capacity as resident manager, exercised almost complete discretion in accepting or rejecting rental applications at Park Place Apartments.  According to Dawson, when Long received a rental application, he was required to first check the prospective tenant's credit history through an independent company called "Employment Screening Services."  *See id.* at 202-04, 211-12.  If the prospective tenant's credit score was below a minimum mark, the application would be rejected, but if the score were satisfactory, Long alone decided whether to approve or reject the application.  *See id.*  Once Long decided to offer a unit to a prospective tenant, he and the prospective tenant would sign a lease, and those papers would then be forwarded to Paige Dawson. Her duties were simply to receive and record the signed leases, and update bookkeeping entries.  *See id.* at 202, 208.  In her words, "The jobs of the resident managers was to handle the applications . . . I did not actually handle any of the screening process."  *Id.* at 202.  For the reasons discussed in the textual paragraph following this marginal note, however, as well as the following facts, this court concludes that the testimony of Milburn long is more likely true than not true.

As discussed in Part One, Section F of this opinion *infra*, Joe Davis and Cindy Burnham were white government testers posing as a married couple, and they visited Park Place Apartments on November 12, 2003.  They spoke with Milburn Long, and he offered to rent them an apartment. Davis returned to Park Place the following day.  This time, he asked for a rental application form, and asked how soon he and Burnham could finalize their lease after completing that form.  This conversation followed:

> JOE DAVIS:  Well, how long does it take to process this if I get it [*i.e.*, the written application] in to you?
>
> MILBURN LONG:  I can tell you that day.
>
> DAVIS:  Okay.  So if we go home and fill it out tonight and bring it in tomorrow, you'll let us know that day?
>
> LONG:  *I can send it into the home office and I can get approval.  Because they're usually available, and I can usually tell you quick.*
>
> DAVIS:  Okay.

Government's trial Ex. 4C, Joe Davis recording, beginning at minute mark 9:50.  (*See also* government's Transcript of recording, at 9) (emphasis supplied).  This evidence supports Milburn Long's testimony that (*i*) he conducted the initial screening of prospective tenants, but (*ii*) "the Dawsons" made the ultimate decision on whether an application was accepted or rejected.  Further, this court could not locate any evidence (aside from Paige Dawson's testimony) establishing that

Paige Dawson is an employee of Dawson Development, and she is primarily responsible for the company's bookkeeping.[44]  Long testified that he spoke to Ms. Dawson about the Bothwells' application, telling her that he had once worked with Rosemary Bothwell's former-husband, and that the Bothwells were "good people."[45] Indeed, Long testified that he "pleaded with Paige [Dawson] to rent them an apartment because the children wanted to go to college and they deserved the good apartments."[46]  Paige Dawson nevertheless rejected the Bothwells' application, because there already were a number of college students living at Park Place, and she did not want any more students to move in.[47]

---

Milburn Long was the final decision-maker as to these matters.

[44] Trial Transcript, at 200.

[45] *See id.* at 130.

[46] *Id.* at 180.

[47] *See id.* at 130.  These facts also are disputed.  Paige Dawson denies that she ever told Milburn Long to reject the Bothwell's rental application.  *See id.* at 204.  Ms. Dawson also denies that she ever told Long to reject applications submitted by college students in general.  *See id.* Again, however, this court the testimony of Milburn Long.

This court believes that Long recommended the Bothwell's application to Paige Dawson. As discussed in the text, Long recognized Rosemary Bothwell's surname, and after a brief conversation, he realized he had once worked with her ex-husband at the Goodyear Tire Company. This connection was apparently important. Rosemary, Beverly, Miesha, and Sheneka Bothwell each testified that Milburn Long was friendly to them throughout their visit.

There also is evidence suggesting that Paige Dawson did not favor college students.  As discussed in Part One, Section A of this opinion *supra*, Francine Allen visited Park Place in April of 2003.  She and Long had the following conversation during her visit:

MILBURN LONG:  And we got a lot of students . . . .  We could fill it up with college students . . . .

FRANCINE ALLEN:  Uh-huh.  Yeah, I'm sure.  I'm sure.

10

Finally, with the fall semester rapidly approaching, Rosemary and Beverly Bothwell moved their daughters into another apartment complex,[48] which was dirty and noisy.[49]  Rosemary Bothwell placed one final telephone call to Milburn Long sometime in September 2003, asking whether all of the units at Park Place were still occupied.[50]  There is no evidence that Long ever offered the Bothwells an apartment.

**C.**    *Unidentified Government Testers — May and June 2003*

Meanwhile, the government continued its tests at the complex.  An African-American male tester visited Park Place on May 21, 2003, at approximately 9:15 a.m.,

---

LONG:   *The owners might not want all college students . . . . But I would.  I'd manage it.  It wouldn't matter to me.*  I mean, you know, as long as you got good kids.

Government's trial Ex. 1A, Francine Allen recording, beginning at minute mark 16:15.  (*See also* government's Transcript of recording, at 16-17) (emphasis supplied).

All of this evidence, however, must be weighed against the other evidence in the record that undermines Milburn Long's credibillity.  As discussed in Part One, Sections A and E of this opinion, Long was recorded as saying that an apartment complex located in Gadsden, Alabama, housed a number of African American college students and students of "mixed nationalities."  He suggested that there was rampant drug use and a high crime rate as a result of that demographic.  Additionally, as discussed in Part One, Section F of this opinion *infra*, Long was recorded as saying that because of the expensive rent at Park Place Apartments, the complex was able to attract "good, nice people."  In context, these comments were charged with racist overtones, which this court cannot ignore.

Even so, upon weighing all of the evidence tugging in opposite directions, this court believes defendant's testimony that he recommended the Bothwells' application to Paige Dawson, but she rejected it.  This court was persuaded at trial, and is still persuaded today, that Long was sympathetic to the Bothwells because of his prior work relationship with Rosemary Bothwell's ex-husband, and he made a good-faith effort to rent an apartment to the Bothwell family.

[48] *See* Trial Transcript, at 21, 56.

[49] *See, e.g., id.* at 21-23 and 57-58.

[50] *See id.* at 63.

and met with Milburn Long.[51]  Long advised the individual that no units were available, but there was a waiting list.[52]  A white male tester visited Park Place later that same morning, at approximately 11:29 a.m., and he also met with Long.[53]  Long also told this individual that no units were available for rent, but there was a waiting list.[54]

The government continued the test series in June.  An African American female, posing as the wife of the preceding black male tester, visited Park Place on June 19 at approximately 9:00 a.m.  She was told that there were no units available for rent.[55]  A white female, posing as the wife of the white male tester, visited Park Place the same day at approximately 1:30 p.m.[56]  She also was told that no units were available for rent.[57]

**D.**   *Barry Briggs and Brad Tobin — September 2003*

The government resumed its testing of Park Place Apartments three months later, in September of 2003, with Barry Briggs and Brad Tobin.  Briggs, who is African American, visited the complex on September 24, at approximately 10:23 a.m.,

---

[51] *See id.* at 113.

[52] *See id.* at 114.

[53] *See* Trial Transcript, at 113.

[54] *See id.* at 114-15.

[55] *See id.*

[56] *See id.*

[57] *See id.*

and was greeted by Milburn Long.[58]  Briggs said he was looking for a two-bedroom

apartment, and he needed to move in by the end of October.[59]  Long responded:

"Yeah, well I know you ain't going to have it this year.  I mean we're just, we're

booked."[60]  Briggs nevertheless put his name on the waiting list,[61] and took a rental

application.[62]  When Long asked Briggs where he was employed, Briggs said he

worked at the Tyson food processing facility in Albertville, Alabama.[63]

Brad Tobin, who is white, visited the complex the same morning at

approximately 11:55 a.m.  He was greeted by Milburn Long.[64]  When Tobin said he

needed a two-bedroom apartment by late October,[65] Long said there were no

immediate vacancies.[66]  Milburn Long nevertheless put Tobin's name on his waiting

list,[67] and promised to "start checking the list" soon, to determine who was (or was

not) still interested in renting.[68]  Long also said he had a rental application form that

---

[58] *See* government's trial Ex. 2A, Barry Briggs recording, at minute mark 21:54.  (*See also* government's Transcript of Briggs recording, at 2).

[59] *See id.* at 22:09 through 22:45.  (TR at 2-3).

[60] *Id.* at 22:45.  (TR at 3).

[61] *See id.* at 28:35.  (TR at 10).

[62] *See id.* at 27:01.  (TR at 9).

[63] *See id.* at 27:50 and 44:20.  (TR at 9 and 21-22).

[64] *See* government's trial Ex. 2B, Brad Tobin recording, at minute mark 4:20.  (*See also* government's Transcript of recording, at 2).

[65] *See id.* at 4:40 through 5:00.  (TR at 2-3).

[66] *See id.*

[67] *See id.* at 12:50.  (TR at 11).

[68] *Id.* at 16:55.  (TR at 15).

could be completed at a later date.[69]  When Long asked where he worked, Tobin said

he was going to be an instructor at Snead State Community College.[70]

Approximately two weeks later, on October 7, Long left a voice mail message

for Tobin asking whether he still needed an apartment.[71]  Long left six more voice

mail messages for Tobin over the next three weeks.[72]  The messages generally

inquired about Tobin's moving plans, and in a message recorded October 22, 2003,

Long specifically said, "We do have an apartment available for you.  We're holding

---

[69] Specifically, Long said that the application form could be completed *after* Tobin was
contacted off the waiting list:

>    MILBURN LONG:  . . . . for the waiting list you give me your name and phone
>    number to where I can call you.  And just tell me when you want it.  And if you want
>    it sometime in late October, I'm not sure we're going to have one unless somebody
>    cancels.
>
>    BRAD TOBIN:  Right, right.
>
>    LONG:  [Inaudible] . . . . your name and phone number . . . . [inaudible].
>
>    TOBIN:  Okay.
>
>    LONG:  I've got about a three or four page application.  You can take one with you
>    if you want, or you it wouldn't be necessary because I'd have to call you before we'd
>    even get to that point.
>
>    TOBIN:  Well, you know what, I'll take whatever you can give me, to be honest with
>    you . . . .

Government's trial Ex. 2B, Brad Tobin recording, beginning at minute mark 11:10.  (*See also*
government's Transcript of recording, at 9-10).

[70] *See id.* at 14:10.  (TR at 12).

[71] *See* government's trial Ex. 2E.

[72] *See* government's trial Exhibits 2F through 2K.

it if you still need one."[73]  There is no evidence that Long ever attempted to contact Barry Briggs, the African American tester.

**E.**    *Mark Bailey and Terry Fulton — October 2003*

The government's next set of tests involved Mark Bailey and Terry Fulton, who visited Park Place in October of 2003.  The two testers made four visits in all. Bailey, who is white, made his first visit to the complex on October 28, at approximately 2:55 p.m., and was greeted by Milburn Long.[74]  Long asked Bailey whether he was looking for an apartment.  When Bailey answered yes, Long said "I've got one I could let you have today."[75]  Long added that at least one more unit would be available in November.[76]  When Bailey indicated that he would visit other apartment complexes in the area to compare them to Park Place, Long responded as follows:

> I know.  I know other places, . . . that you don't want to go to because I know the mix there and the problems.  Like Gadsden, where I'm from, you've got the Gadsden State College.  And the apartments beside it, they've got — I forgot how many units they got, it's large.  But it's got continuous drug problems.  I mean it's bad.  It's a mix of all nationalities, which there is nothing wrong with nationalities but there's problems there because many nationalities and so many drugs and

---

[73] Government's trial Ex. 2J, recording of October 22, 2003 message.  (The transcript of this recording is erroneously labeled as Plaintiff's Ex. 2I, rather than 2J).

[74] *See* government's trial Ex. 3A, Mark Bailey recording, at 13:15.  (*See also* government's Transcript of recording, at 2).

[75] *See id.* at 13:45.  (TR at 3).

[76] *See id.* at 17:58.  (TR at 11).

they're college students.  It's, I wouldn't own those apartments.  They just sold this year.  And they sold extremely cheap.  And that's probably why.[77]

Terry Fulton, who is African American, made his first visit to Park Place Apartments the following day at approximately 9:40 a.m.[78]  Unlike the other tests in this case, his initial visit were not captured on a voice recording.  Instead, Fulton completed a written "Test Narrative" at 11:04 a.m. the same day.[79]  According to Fulton, he met with Milburn Long and said he was looking for a two-bedroom apartment.  Long's purported response was that "he would not have any available apartments until next year."[80]  Fulton made a second visit the same day, however, at approximately 1:55 p.m.,[81] and this test *was* captured on a recording.  Again, Fulton was greeted by Milburn Long:

> TERRY FULTON:  . . . . How are you doing again?  I don't know if you remember me.  I was here earlier today.
>
> MILBURN LONG:  Yea, sure I do.
>
> FULTON:  I talked to my wife, and I told her that you didn't have anything available right now, but you would have something next year.  She wanted to know —

---

[77] *Id.* beginning at 38:30.  (TR at 42).

[78] *See* government's trial Ex. 3D, "Test Narrative," at 1.

[79] *See id.*

[80] *Id.* at 1-2.

[81] *See* government's trial Ex. 3C, Terry Fulton recording, at 53:45.  (*See also* government's Transcript of recording, at 2).

LONG:  Unless some changes could come up.  I'm not saying, I don't . . . [jumbled words] . . . That was the worst scenario.

FULTON:  Okay.  Between now and next year?

LONG:  Right.  You never know when somebody is going to cancel or if something don't work out that causes something to be open.

FULTON:  Right, right.[82]

Later the same day, Bailey (the white tester) made his final visit in this test series.[83]  Long again told him that one unit was immediately available for rent, and another unit would be available in November.[84]  Long also asked Bailey if he was a government tester, but Bailey denied that he was.[85]  Long explained his train of thought, saying,

> I had somebody here today I think might have been a government checker.  I'm not sure.  Cause there aren't any blacks here, and I don't discriminate.  But we, the deposit is 495 [dollars] and the rent is 535 including, you know, the pest, water, garbage, sewer, 515 is really going toward the rent.  And that sort of eliminates, we've got two doctors here . . . they're nice people.  It keeps a better level of people here I think. Keeping it maintained, keeping it safe, and keeping the rent raised to the max . . . .[86]

---

[82] *Id.* beginning at 57:15.  (TR at 2-3).

[83] *See* government's trial Ex. 3B, second Mark Bailey recording, at minute mark 1:10 (identifying time of visit as approximately four o'clock p.m.).  (*See also* government's Transcript of recording, at 2).

[84] *See id.* at 9:15 (TR at 7-8), 22:17 (TR at 21-22), and 27:05 (TR at 26-27).

[85] *See id.* at 27:25 (TR at 27).

[86] *Id.* beginning at 27:35.  (TR at 27-28).

**F.**    *Cindy Burnham and Joe Davis, and, Yolanda Hilliard and Perry McCorkle —*
*November 2003*

The government's last set of tests involved four testers posing as two married

couples.   Cindy Burnham and Joe Davis, who are white, visited Park Place

Apartments on November 12, 2003, at approximately 2:05 p.m.[87]  They were greeted

by Milburn Long.[88]  They asked whether any two-bedroom apartments would be

available on or about December 1, 2003,[89] and Long replied, "Yea, I'll have some.

You need upstairs or downstairs or does it matter? . . . . I will have a choice of down

or up."[90]

Long also said there were few apartment complexes in the area that were

comparable to Park Place:

> MILBURN LONG:  . . . . I don't know of any nice areas around.  Most
> of them are not what I call desirable.  I mean it's according to what you
> like.  But I can't say it without saying the wrong thing, but like in real
> estate, I'm a real estate broker, we have to be real careful about what we
> said.  We wasn't allowed to tell nobody anything unless they asked.  If
> they asked if there's blacks in the neighborhood, we just have to tell
> them they have to ride by and look for themselves.  We can't really tell
> you if we're selling real estate.
>
> JOE DAVIS:  Yes.

---

[87] *See* government's trial Ex. 4A, Cindy Burnham and Joe Davis recording, at minute mark
0:01.  (*See also* government's Transcript of recording, at 2).

[88] *See id.* at 6:30.  (TR at 2).

[89] *See id.* beginning at 7:20.  (TR at 4).

[90] *Id.*

18

MIILBURN LONG:  You know, it's just that way.  But this deposit and this [monthly rental] price controls what's here.

JOE DAVIS:  Okay.

MILBURN LONG:  And it's all people like you.  It's all good, nice people.[91]

Long also said Davis and Burnham could lease a unit for the remainder of the month rent-free, if they moved in immediately.  In his words, "right now, we've got a special.  November, the whole month is free because people who moves in today just gets the rest of the month."[92]  Long added that he would check with upper management to see whether December also might be rent-free for new tenants.  In his words,  "I'm going to ask them also because I think I'm going to have enough vacancies that I need to do it if I want to do it . . . . I'm going to ask them to give December free and just pay deposit only."[93]

Yolanda Hilliard and Perry McCorkle, who are African American, visited Park Place Apartments the following day, at approximately 9:15 a.m.  They also were greeted by Milburn Long.[94]  When Hilliard represented that she and McCorkle needed an apartment in two to three weeks (*i.e.*, late November to early December), Milburn

---

[91] *Id.* beginning at 29:35.  (TR at 29-30).

[92] *Id.* at 30:15.  (TR at 30).

[93] *Id.* at 30:30.  (TR at 31).

[94] *See* government's trial Ex. 4B, Yolanda Hilliard and Perry McCorkle recording, at minute mark 6:10.  (*See also* government's Transcript of recording, at 2-3).

Long responded: "I can give you an application.  I can show you one.  And I'll give you a brochure of what they look like."[95]   Later in the conversation, Hilliard attempted to broach the topic again, asking whether any units would be available for rent in two to three weeks.[96]   In response, Long asked whether they preferred a downstairs or upstairs unit, and whether they had any children.[97]   Long also said he could give them a rental application, and show them a unit.[98]   When Hilliard asked a third time whether any units would be available for rent in two to three weeks, Long checked a list, and finally said a downstairs unit would be available.[99]   Even so, he said there was a waiting list for vacant units, and eight names already were on the list.[100]

Later, Hilliard and McCorkle viewed an unoccupied unit,[101] and Hilliard asked whether that particular unit would be available for rent in two to three weeks.  Long said he would have to call the individuals on his waiting list, and offer them first opportunity to rent the unit.[102]   When Long asked Hilliard and McCorkle where they

---

[95] *Id.* at 8:10.  (TR at 4).

[96] *See id.* at 12:10.  (TR at 11).

[97] *See id.*

[98] *See id.* at 12:55.  (TR at 12).

[99] *See id.* at 14:07 through 15:45.  (TR at 14-15).

[100] *See* government's trial Ex. 4B, Yolanda Hilliard and Perry McCorkle recording, at minute mark beginning 22:55.  (*See also* government's Transcript of recording, at 27-28).

[101] *See id.* at 24:05 through 35:15 (TR at 29-47).

[102] *See id.* at 35:18.  (TR at 47).

worked, McCorkle said he worked for Bell South Telecommunications. [103]

The government ran one more test later that same day.  Joe Davis, the white tester who had been paired with Cindy Burnham, made a second visit to Park Place, and was greeted by Milburn Long.[104]  Davis said he and his "wife" were interested in renting an apartment, but they had not received anl application form.[105]  Long responded: "I didn't know I didn't give you one . . . . Okay.  I try to remember to give everybody one if they want one."[106]  Davis also asked Long to identify the specific units that would be available on or about December 1.  Long said three units were immediately available for rent (units 12, 15, and 44), but there was no guarantee they would be available on December 1.[107]  Even so, Long said that at "this time of year, it looks like we're going to have something for you, and it's not a problem."[108]  When Long asked Davis where he was employed, Davis said he worked at the airport located in Boaz, Alabama, for U.S. Airways.[109]

---

[103] *See id.* at 50:05.  (TR at 69).

[104] *See* government's trial Ex. 4C, Joe Davis recording, at minute marks 3:20 and 4:50.  (*See also* government's Transcript of recording, at 2).

[105] *See id.* at 4:56.  (TR at 2).

[106] *Id.* at 5:15.  (TR at 2).

[107] *See id.* at 7:35 through 8:24.  (TR at 5-6).

[108] *Id.* at 11:50.  (TR at 11).

[109] *See id.* at 9:20 through 10:53.  (TR at 8-9).

**G.**    *The Allegation that Paige Dawson Instructed Milburn Long to Not Waste Time on Government Testers*

Milburn Long testified that, sometime during 2003, Paige Dawson instructed him to not waste time on persons he believed to be government testers, as opposed to *bona fide*, prospective tenants:

> Q.    Well, but your testimony . . . was that you didn't bother with the people who you thought were testers; right?
>
> A.    The Dawsons told me not to spend time on people that were testers, because the workload was so heavy on the maintenance; not to waste time. I was working 12 hours a day, as it was.
>
> Q.    Again, this is Paige Dawson that's supposedly told you this; right?
>
> A.    Yes, sir.[110]

The court rejects this aspect of defendant's testimony, on the strength of Paige Dawson's testimony at trial. Ms. Dawson denied that she ever spoke to Milburn Long about government testers, or more specifically, that she ever told him not to waste time on government testers, and to concentrate on maintenance work instead.[111] Based upon observation of each person's demeanor under examination, this court finds Ms. Dawson's testimony to be more persuasive than Long's. Moreover, ignoring persons believed to be government testers invites the unpleasant prospect

---

[110] Trial Transcript, at 153-54.

[111] *See id.* at 201-02.

of a lawsuit by the United States government.  There is no reason to believe that Paige

Dawson gave instructions to Long that would expose Dawson Development

Company to civil liability under the Fair Housing Act.

## PART TWO

*Conclusions of Law — The Attorney General's Standing to Bring Suit*

Congress enacted the Fair Housing Act in 1968 for the purpose of eliminating

housing practices that discriminated on the basis of an individual's race, color,

religion, sex, familial status, or national origin.  *See, e.g., United States Department*

*of Housing and Urban Development v. Blackwell*, 908 F.2d 864, 868 (11th Cir. 1990).

Individuals and private organizations may bring suit for violations of the Act.  *See,*

*e.g., Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982).  The Attorney

General also may commence a civil action if either of two requirements is met:

> Whenever the Attorney General has *reasonable cause to believe* that [i]
> any person or group of persons is engaged in a *pattern or practice of*
> *resistance* to the full enjoyment of any of the rights granted by this
> subchapter, *or* [ii] that any group of persons has been denied any of the
> rights granted by this subchapter and such *denial raises an issue of*
> *general public importance*, the Attorney General may commence a civil
> action in any appropriate United States district court.

42 U.S.C. § 3614(a) (emphasis and alterations supplied).  A district court's review of

the Attorney General's decision to bring suit under § 3614(a) "should be a limited

one."  *United States v. Pelzer Realty Company, Inc.*, 484 F.2d 438, 445 (5th Cir.

1973).[112]

"There need not be an actual pattern or practice of resistance or an actual denial that raises an issue of general public importance.  The only requirement is that the Attorney General have *reasonable cause* to believe that such conditions exist." *Id.* (emphasis in original).   "To fulfill the 'pattern or practice' requirement, the discriminations must result from more than an isolated or accidental or peculiar event." *Id.* (citations omitted).  Stated differently, the government "must show that any discriminatory act by the defendant[ ] was not an isolated or accidental departure from otherwise nondiscriminatory practices." *Id.   See also United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 124 (5th Cir. 1973) (observing that the number of violations is not necessarily determinative to the analysis; rather, each case must turn on its own facts).

Additionally, "[t]he question of what constitutes an issue of general public importance is, absent specific statutory standards, a question most appropriately answered by the executive branch." *United States v. Northside Realty Associates, Inc.*, 474 F.2d 1164, 1168 (5th Cir. 1973).  Accordingly, the Attorney General has "wide discretion" to determine whether an issue of general public importance is

---

[112] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

raised.  *Id.*

This court determines that *both* aspects of § 3614(a) are met in this case.  The Attorney General had reasonable cause to believe that Milburn Long discriminated against five government testers on the basis of their race,[113] during a period of approximately seven months.  The Seventh Circuit has found a "pattern or practice" of discrimination in cases similar to this one, although in one instance, the frequency of the discriminatory acts was greater.  *See United States v. Balistrieri*, 981 F.2d 916, 929-30 (7th Cir. 1992) (five African American testers and one African American *bona fide* prospective tenant were treated less favorably than their white counterparts during the course of approximately one month); *United States v. Di Mucci*, 879 F.2d 1488, 1492 & nn.6-7 (7th Cir. 1989) (six specific incidents in which African American apartment seekers or testers were treated less favorably than their white counterparts) (time period unspecified).

Additionally, and unquestionably, an issue of general public importance was raised.  This court will not question the Attorney General's decision to target the arbitrary and loathsome act of discriminating among citizens on the basis of race.

---

[113] These individuals were Francine Allen, Barry Briggs, Terry Fulton, Yolanda Hilliard, and Perry McCorkle.

# PART THREE

### *Conclusions of Law — Liability*

The Fair Housing Act makes it unlawful, among other things, for the owners

or leasing agents of housing units:

> **(a)**  To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
>
> **(b)**  To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.
>
> . . . .
>
> **(d)**  To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

42 U.S.C. §§ 3604(a), (b) and (d).

Where, as here, the government seeks to prove a defendant's discriminatory

intent through the use of circumstantial evidence, federal courts apply the three-step,

analytical framework that has become familiar in the context of employment

discrimination cases brought under Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.  See United States Department of Housing and Urban*

*Development v. Blackwell*, 908 F.2d 864, 870 (11th Cir. 1990). That framework, first

announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973), requires the following:

> First, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. Second, if the plaintiff sufficiently establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action. Third, if the defendant satisfies this burden, the plaintiff has the opportunity to prove by a preponderance that the legitimate reasons asserted by the defendant are in fact mere pretext.

*Blackwell*, 908 F.2d at 807 (citations omitted).

**A.**    *The Government Testers*

A defendant may be liable under 42 U.S.C. §§ 3604(b) and (d) even when the

alleged discrimination is directed toward government testers, as opposed to *bona fide,*

prospective tenants. *See United States v. Balistrieri*, 981 F.2d 916, 929 (7th Cir.

1993). That is because the making of a "*bona fide* offer" is an essential element of

a claim under 42 U.S.C. § 3604(*a*). In contrast, §§ 3604(*b*) and (*d*) prohibit

discrimination against "any person" on the basis of race, not just *bona fide* apartment

seekers. *See id.* (citing *Havens Realty Corporation v. Coleman*, 455 U.S. 363, 373-74

(1982) (holding that a tester who has been the object of a misrepresentation made

unlawful under § 3604(d) has standing to maintain a claim for damages under the Fair

Housing Act)).

27

1. *The government's prima facie case*

The government may establish a *prima facie* case of discrimination under both §§ 3604(b) and (d) by demonstrating that: (a) one group of testers were members of a racial minority or other protected class; (b) that group requested information as to availability of a particular unit type; (c) defendant failed or refused to provide truthful information as to availability of that unit type; while (d) white applicants were provided truthful information. *See Darby v. Heather Ridge*, 806 F. Supp. 170, 176 (E.D. Mich. 1992) (suit brought by African American persons who were told by landlord's agent that apartments were unavailable). *See also The Open Housing Center, Inc. v. Kessler Realty, Inc.*, 2001 WL 1776163, at *6 (E.D.N.Y. Dec. 21, 2001) ("These same four elements have been used in both section 3604(b) and 3604(d) cases.").

In this case, the government conducted five sets of tests between April and November of 2003. The government asserts that, with but  one exception,[114] the evidence from each set of tests is sufficient to establish a *prima facie* case of discrimination.  This court agrees.

---

[114] The government conducted its second set of tests in May and June of 2003.  *See* Part One, Section C of this opinion *supra*.  Two African American testers and two white testers, whose names are not specified in the record, were involved.  The government does not assert a violation of the Fair Housing Act for actions related to these tests.

### a. *Francine Allen and Aleithea Williams*

Francine Allen, who is African American, visited Park Place Apartments on April 22, 2003, and requested information as to the availability of a two-bedroom apartment.  Aleithea Williams, who is white, visited Park Place Apartments later the same day, and also requested information as to the availability of a two-bedroom unit. Milburn Long failed or refused to provide truthful information to Allen.  In a voice mail message recorded on May 7, 2003, Long advised Williams that a unit had become available for rent.  In contrast, there is no evidence that Milburn Long attempted to contact Allen.

### b. *Barry Briggs and Brad Tobin*

Barry Briggs, who is African American, visited Park Place Apartments on September 24, 2003, and he said he was looking for a two-bedroom apartment.  Brad Tobin, who is white, visited Park Place Apartments later the same day, and he also said he was looking for a two-bedroom unit.  Milburn Long failed or refused to provide truthful information to Briggs.  Long left a voice mail message for Tobin on October 22, 2003, saying "We do have an apartment available for you.  We're holding it if you still need one."[115]  Long left six more messages for Tobin the same month, generally inquiring about his move.  In contrast, there is no evidence that Long

---

[115] Government's trial Ex. 2J, recording of October 22, 2003 message.  (The transcript of this recording is erroneously labeled as Plaintiff's Ex. 2I, rather than 2J).

attempted to contact Briggs.

c.   *Mark Bailey and Terry Fulton*

Mark Bailey, who is white, visited Park Place Apartments on October 28, 2003, and he made a second visit the next day.  Terry Fulton, who is African American, made two visits between Bailey's.  Both men requested information as to the availability of a two-bedroom apartment, but Milburn Long failed or refused to provide truthful information to Fulton.  Long told Bailey that an apartment unit was immediately available for rent, and that another unit would be available in November. In contrast, Long told Fulton that absent any changes, no apartments would be available until the following year.

d.   *Cindy Burnham and Joe Davis, and, Yolanda Hilliard and Perry McCorkle*

Cindy Burnham and Joe Davis, who are white, visited Park Place Apartments on November 12, 2003.  Yolanda Hilliard and Perry McCorkle, who are African American, visited Park Place the next day.  Davis, the white male tester, made the final visit in the test series, also on November 13.  While both couples spoke with Milburn Long, and asked whether any two-bedroom apartments would be available on or about December 1, he failed or refused to provide truthful information to Hilliard and McCorkle.  Long told Davis and Burnham that units were immediately

available for rent, and in all likelihood, at least one unit would be available December 1. He also said that, if they moved in immediately, the remainder of the month of November would be rent-free, and December might be rent-free as well. In contrast, when Hilliard said she and McCorkle needed an apartment in late November or early December, Long was evasive, saying he could offer them a rental application, show them a unit, or provide them with a brochure. Worse, when Hilliard pressed the issue further, Long admitted that one unit would be available for rent in early December, but there was a waiting list for that unit.

**2.** *Defendant's legitimate, non-discriminatory reasons for his challenged actions*

Once the government satisfies the elements of its *prima facie* case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for his actions. Long testified that he spoke to Paige Dawson sometime during the period relevant to this suit, and she instructed him not to spend time with persons he believed to government testers. Long also testified that, putting these instructions into practice, he was able to accurately and consistently identify the African American government testers involved in this case. According to Long, there were three tell-tale signs of a government tester: (1) when asked where they were employed, testers either "wouldn't tell me where they worked," or gave untruthful

answers;[116] (2) testers were "unprofessional";[117] and (3) testers put their names and contact information on his waiting list, but failed to complete a written rental application form.[118]

For the sake of discussion, this court will presume that a decision to treat government testers less favorably than *bona fide*, prospective tenant (or persons who are perceived by a defendant to be *bona fide*, prospective tenants) is — although not a particularly intelligent course of action — a legitimate, non-discriminatory reason for defendant's actions.  The burden therefore shifts back to the government to prove that the reasons asserted by Milburn Long are merely a pretext for unlawful discrimination.

**3.**     *Pretext*

As a preliminary matter, this court rejects Long's assertion that he was instructed by Paige Dawson not to spend time with government testers.  Long's testimony on this issue is not credible, for reasons discussed in Part One, Section G of this opinion *supra*.  Additionally, with one exception, this court rejects Long's assertion that he correctly identified the African American testers involved in this

---

[116] Trial Transcript, at 161-63.

[117] *Id.* at 129.  Long elaborated that, "[n]ot saying it negatively at all, because I have a lot of black friends and all nationalities of friends.  Not just black, but it seemed like the blacks were very poorly trained to be a professional tester, if they really want to pull it off and not be sending out as a tester." *Id.* at 143.

[118] *See id.* at 131-32, 154, 161.

case, and treated them less favorably on that basis.

      **a.**    *Francine Allen and Aleithea Williams*

Francine Allen, who is African American, visited Park Place Apartments on April 22, 2003, and Aleithea Williams, who is white, made a visit later that same day. This court does not believe that Milburn Long identified Allen as a government tester.

Long testified that, whenever an applicant provided untruthful information about his or her place of employment, he identified that applicant as a tester, and wasted no more time with that individual.  He testified:

> I'm not sure about the names at this point, specifically because when they tell me they work at *Red Lobster*, and I call, they don't work there; they work at the airport; they're going to work at *Snead College*, I call and they don't know them, that kind of thing[ ].[119]

During Allen's visit, Milburn Long asked her where she was employed.  Allen said she had a consulting business, and her husband would be working at *Snead State Community College*, located in Boaz, Alabama.[120]  Long also asked Williams where she worked.  Williams said she was not working, but her husband would soon begin a management position at a *Red Lobster* restaurant located in Gadsden, Alabama.[121]

---

[119] Trial Transcript, at 162 (emphasis supplied).

[120] *See* government's trial Ex. 1A, Francine Allen recording, at minute marks 16:10 and 28:52. (*See also* government's Transcript of recording, at 16 and 36).

[121] *See* government's trial Ex. 1B, Aleithea Williams recording, at minute mark 21:20.  (*See also* government's Transcript of recording, at 4).

Of course, had Long checked the information provided by Allen and Williams, he would have determined that *both* applicants were not truthful, and rejected *both* applications.  He did not.

Long also asserts that the African American testers were "unprofessional."  The court has reviewed the recording of Allen's conversation with Long, and finds that Allen was polite, articulate, friendly, and there was no hint of nervousness in her voice.  Although it is impossible to measure other important criteria (such as body language and appearance) from a sound recording, the court finds that Ms. Allen's test was convincing.

Finally, Long testified that, while a government tester would put his or her name and contact information on his waiting list, he or she would fail to complete the rental application form.  There is a problem with this defense, however.  Long told Allen that she could have a rental application *if she wanted one*:

> MILBURN LONG:  I am going to give you an application.
>
> FRANCINE ALLEN:  Okay.
>
> LONG:  That's one thing, *if you want one*.
>
> ALLEN:  Yeah, I do.[122]

Further, Long said there was no urgency to complete the application form.  In his

---

[122] Government's trial Ex. 1A, Francine Allen recording, at 10:40.  (Government's Transcript of recording, at 7) (emphasis supplied).

34

words, "You could do that [*i.e.*, complete the application form] now or you could take it with you, *whatever.  It doesn't matter.*"[123]  Long later watched as Allen put her name and contact information on his waiting list.[124]

In contrast, Long told Williams that she could take the rental application home with her, complete it, and return it to him by facsimile.[125]  Long said that *once he received the application, he would put Williams' name on his waiting list.*[126]  In his words, "And like I said, fax it back, and we'll get you on the list."[127]

Therefore, while Allen was led to believe that completion of the written application form was not important, Williams was led to believe that it was a necessary prerequisite for placing her name on the waiting list, and moving her application forward.  This is a notable distinction.  To the extent that completion of an application form *was* an essential step in the application process, Long's statements to Allen, the African American tester, obfuscated that fact.

The court finds that the government has established its *prima facie* case of discrimination; and, while Milburn Long is able to articulate arguably non-

---

[123] *Id.* at 11:30.  (TR at 8) (emphasis supplied).

[124] *See id.* at 23:40 through 24:50.  (TR at 28-29).

[125] *See* government's trial Ex. 1B, Aleithea Williams recording, at minute marks 1:05:00 and 1:08:08.  (*See also* government's Transcript of recording, at 46 and 50).

[126] *See id.* at 1:08:08.  (TR at 50).

[127] *See id.*

discriminatory reasons for his actions, the government has established by a preponderance of the credible evidence that Long's stated reasons are mere pretexts for race discrimination. Milburn Long did not receive instructions from Paige Dawson to ignore government testers. He did not correctly identify Francine Allen as a government tester. Defendant Long is liable under §§ 3604(b) and 3604(d) of the Fair Housing Act for discriminating against Francine Allen on the basis of her race.

> **b.** *Barry Briggs and Brad Tobin*

Barry Briggs, who is African American, and Brad Tobin, who is white, visited Park Place Apartments on September 24, 2003. This court does not believe that Milburn Long correctly identified Briggs as a government tester.

As noted, Long testified that whenever an applicant provided untruthful information about his place of employment, he identified the applicant as a tester. During Briggs's visit, Long asked him where he was employed. Briggs said he worked at the Tyson food processing facility in Albertville, Alabama.[128] Long also asked Tobin where he was employed, and Tobin said he would be working at *Snead State Community College.*[129] Therefore, if Long's testimony is to be believed, the

---

[128] *See* government's trial Ex. 2A, Barry Briggs recording, at minute marks 27:50 and 44:20. (*See also* government's Transcript of recording, at 9 and 21-22).

[129] *See* government's trial Ex. 2B, Brad Tobin recording, at minute mark 14:10. (*See also* government's Transcript of recording, at 12).

court must conclude that he knew Tobin, *the white tester*, was not truthful about his place of employment.[130]  But Long never rejected Tobin's application.

Long also asserts that African American testers were "unprofessional."  This court reviewed the recording of Briggs's conversation with Long, however, and concludes that  Briggs was polite and articulate, and there was no hint of nervousness in his voice.  Briggs's test was convincing.

Finally, Long testified that whenever an applicant failed to complete a rental application form, he identified that person as a government tester.  This testimony is unpersuasive in this instance because there is no evidence that *either* Briggs *or* Tobin submitted a written application.  Indeed, Long emphasized to both testers that the waiting list — rather than the application form — was more important.  During Tobin's visit, Long said the first step in the application process was to put Tobin's name and contact information on the waiting list.  An application form would need to be completed only *after* Tobin was called:

> MILBURN LONG:  . . . . for the waiting list you give me your name and phone number to where I can call you.  And just tell me when you want it [*i.e.*, the apartment unit].  And if you want it sometime in late October, I'm not sure we're going to have one unless somebody cancels.
>
> BRAD TOBIN:  Right, right.

---

[130] There is no evidence that Long ever contacted the Tysons food processing facility to inquire about Barry Briggs.

LONG:  [Inaudible] . . . . your name and phone number . . . . [inaudible].

TOBIN:  Okay.

LONG:  *I've got about a three or four page application.  You can take one with you if you want, or you it wouldn't be necessary because I'd have to call you before we'd even get to that point.*

TOBIN:  Well, you know what, I'll take whatever you can give me, to be honest with you . . . .[131]

Similarly, during Briggs's visit, he put his name on Long's waiting list, and he received a rental application form.  But Long said the waiting list was "the main thing":

BARRY BRIGGS:  Okay.  All right.  Well, I'll just put my name and put a number you can reach me at.

MILBURN LONG:  That's the main thing.

BARRY BRIGGS:  Okay.[132]

In view of the foregoing, the court finds that the government has established its *prima facie* case of discrimination; and, although Milburn Long is able to articulate arguably non-discriminatory reasons for his actions, the government has established that his stated reasons are mere pretexts for race discrimination.  Milburn Long did not receive instructions from Paige Dawson to ignore government testers.

---

[131] Government's trial Ex. 2B, Brad Tobin recording, beginning at minute mark 11:10.  (*See also* government's Transcript of recording, at 9-10) (emphasis supplied).

[132] Government's trial Ex. 2A, Barry Briggs recording, at minute mark 28:35.  (*See also* government's Transcript of recording, at 10).

He did not correctly identify Barry Briggs as a government tester.  Defendant Long is liable under §§ 3604(b) and 3604(d) of the Fair Housing Act for discriminating against Barry Briggs on the basis of his race.

> **c.**   *Mark Bailey and Terry Fulton*

Mark Bailey, who is white, visited Park Place Apartments on October 28 and 29, 2003.  Terry Fulton, who is African American, made two visits between Bailey's, on October 29.  Unlike the other tests, the government in this instance has not proven by a preponderance of the evidence that defendant Long discriminated against Fulton because of his race.

Fulton's first visit to Park Place occurred during the morning of October 29, but it was not captured on a recording.  Rather, Fulton completed a written "Test Narrative" at 11:17 o'clock a.m. the same day, in an effort to document his visit.  The probative value of the Test Narrative is limited.  Long asserts, for example, that he could identify African American testers because they were "unprofessional."  The Test Narrative cannot possibly be used to rebut that contention, because the *quality* of the interaction between Fulton and Long cannot be ascertained.  Fulton also made a second visit to Park Place later the same day, however, and that conversation *was* taped.  This court has carefully reviewed that recording, and finds that the interaction between Fulton and Long exhibits nervousness, particularly at the beginning of their

conversation.

These observations are significant because, at some point, Long *did* come to suspect that Fulton was a government tester.  Following Fulton's second visit, the government sent Bailey, the white tester, for the final test in the series.  Long said to Bailey during that visit, "I had somebody here today I think might have been a government checker."[133]  Although Long did not specify the name of this particular person, this court concludes that Long was referring to Terry Fulton.

In view of the foregoing, this court finds that there is considerable traction to Long's arguments with regard to this series of tests.  This court accepts that Long was able to identify Fulton as a government tester from the time of their first meeting, and once he ascertained that fact, he dismissed Fulton's rental inquiries as fictitious.  The government has not established by a preponderance of the evidence that race was the motivating factor here.

> **d.** *Cindy Burnham and Joe Davis, and,Yolanda Hilliard and Perry McCorkle*

Cindy Burnham and Joe Davis, who are white, visited Park Place Apartments on November 12, 2003.  Yolanda Hilliard and Perry McCorkle, who are African American, made their visit the next morning.  Davis then returned for a second visit

---

[133] Government's trial Ex. 3B, second Mark Bailey recording, at minute mark 27:35.  (*See also* government's Transcript of recording, at 27).

later the same day.  This court does not believe that Milburn Long correctly identified either Hilliard or McCorkle as government testers *before* making specific misrepresentations in violation of the Fair Housing Act.

During Hilliard and McCorkle's visit, Long asked them where they were employed.  McCorkle said he worked for Bell South.[134]  During Davis's second visit, Long asked him where he worked, and Davis said at *the airport* located in Boaz, Alabama.[135]  Therefore, if Long's testimony is to be believed, this court must conclude that he knew Davis, *the white male tester*, was untruthful about his place of employment.[136]

Long also asserts that the African American testers were "unprofessional."  He specifically testified that "the married couple that acted to be married — I mean, I've been around the block.  They were not married."[137]  Hilliard and McCorkle drove to Park Place Apartments on November 13 at approximately 9:15 a.m.[138]  Within *thirty seconds* of meeting Long, Hilliard inquired about the availability of a two-bedroom

---

[134] *See* government's trial Ex. 4B, Yolanda Hilliard and Perry McCorkle recording, at minute mark 50:05.  (*See also* government's Transcript of recording, at 69).

[135] *See* government's trial Ex. 4C, Joe Davis recording, at minute mark 9:20 through 10:53.  (*See also* government's Transcript of recording, at 8-9).

[136] There is no evidence that Long contacted BellSouth to see whether McCorkle, the African-American male tester, was also lying about his employment.

[137] Trial Transcript, at 135.

[138] *See* government's trial Ex. 4B, Yolanda Hilliard and Perry McCorkle recording, at minute marks 6:10 and 7:44.  (*See also* government's Transcript of recording, at 2-3).

apartment.  Long was evasive, saying "I can give you an application.  I can show you [a unit].  And I'll give you a brochure of what they look like."[139]  Within another *four minutes* Hilliard attempted to broach the topic again, asking whether any units would be available for rent in two to three weeks.[140]  Long still was evasive, blocking Hilliard's question with some questions of his own:  did they prefer a downstairs or upstairs unit, and did they have any children?[141]  The simple fact was that there were units available for rent, which Long failed to disclose.

The timing of these exchanges is significant.  Long seeks to persuade this court that, within 30 seconds (or four minutes at the outside) of meeting Hilliard and McCorkle, he ascertained that they were not married, identified them as testers, and dismissed their rental inquires accordingly.  This court cannot accept such assertions after listening to the audio recording. While Long *eventually* may have ascertained that Hilliard and McCorkle were not married (they met with Long for over forty minutes), he could not have made that determination so early in their conversation. To the extent that Long ascertained the true identities of the testers *in hindsight*, that will not exonerate him from liability.

Finally, Long testified that, whenever people failed to complete a rental

---

[139] *Id.* at minute mark 7:44 through 8:10.  (TR at 3-4).

[140] *See id.* at 12:10.  (TR at 11).

[141] *See id.*

application form, he identified them as government testers.  In this series of tests, however, Long offered to rent an apartment to Davis and Burnham, without asking them to complete a rental application.  In contrast, when Hilliard and McCorkle inquired about apartment availability, Long said he could give them an application form, but he failed to make a rental offer.  Therefore, in this instance, the application form was simply an additional hurdle for the African American testers in the rental applicant process.  Long cannot rely on such evidence to assert that he did not discriminate on the basis of race.

The court finds that the government has established its *prima facie* case of discrimination; and, although Long is able to articulate reasons for the challenged conduct that this court has assumed to be "legitimate and non-discriminatory,"  the government proves by a preponderance of the credible evidence that Long's stated reasons are mere pretext for race discrimination.  Long did not receive instructions from Paige Dawson to ignore government testers.  Long did not correctly identify Yolanda Hilliard and Perry McCorkle as government testers, but even if he did, he did so only in hindsight.  Defendant is liable under §§ 3604(b) and 3604(d) of the Fair Housing Act for discriminating against Hilliard and McCorkle because of their race.

**B.**     *The Bothwells*

Section 3604(a) of the Fair Housing Act makes it unlawful to "refuse to sell or

rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). A plaintiff establishes a *prima facie* case under § 3604(a) by showing that: "1) she belongs to a minority; 2) the defendant was aware of it; 3) the plaintiff was ready and able to accept defendant's offer to rent; and 4) the defendant refused to deal with her." *Hamilton v. Svatik*, 779 F.2d 383, 387 (7th Cir. 1985).

Beverly and Rosemary Bothwell visited Park Place Apartments sometime between April and June of 2003, accompanied by their daughters Miesha and Sheneka, and they were greeted by Milburn Long. The Bothwells inquired about the availability of a two-bedroom apartment for Miesha and Sheneka, who planned to attend Snead State Community College in August, but Long said no units were immediately available for rent. Beverly and Rosemary Bothwell put their names on Milburn Long's waiting list, and Beverly Bothwell also completed a rental application form. Even so, Milburn Long never offered the Bothwells an apartment for rent.

On the basis of these facts, the court will assume, for the sake of discussion, that the government has satisfied its *prima facie* case of discrimination. The Bothwells are African American, Milburn Long was aware of their race, and the

44

Bothwells were ready and able to accept a rental offer made by Long.  The court also will assume that Long refused to rent an apartment to the Bothwells.

The burden therefore shifts to Milburn Long to assert a legitimate, non-discriminatory reason for his conduct.  At trial, Milburn Long testified that he wanted to rent an apartment to the Bothwells, but he was unable to obtain approval from Paige Dawson.  Long testified that he recommended the Bothwells' application to Ms. Dawson, saying he had worked with Rosemary Bothwell's ex-husband at the Goodyear Tire Company, and that the Bothwells were "good people."[142]  Indeed, Long testified that he "pleaded with Paige [Dawson] to rent them an apartment because the children wanted to go to college and they deserved the good apartments."[143]  Paige Dawson nevertheless rejected the Bothwell's application, because there already were a number of college students living at Park Place, and she did not want any more students to move in.

The burden therefore shifts back to the government to prove by a preponderance that Milburn Long's stated reason for his conduct is mere pretext for unlawful discrimination.  However, for reasons discussed in Part One, Section B(1) of this opinion *supra*, and in particular notes 43 and 47, the court finds that Long's

---

[142] Trial Transcript, at 130.

[143] *Id.* at 180.

testimony is more credible on all issues pertinent to the Bothwells' application.

Accordingly, Milburn Long is not liable under § 3604(a) of the Fair Housing Act for

events related to the Bothwell family.

**C.**    *42 U.S.C. § 3604(c)*

Section 3604(c) of the Fair Housing Act makes it unlawful:

> To make, print, or publish, or cause to be made, printed, or published
> any notice, statement, or advertisement, with respect to the sale or rental
> of a dwelling that indicates any preference, limitation, or discrimination
> based on race, color, religion, sex, handicap, familial status, or national
> origin, or an intention to make any such preference, limitation, or
> discrimination.

42 U.S.C. § 3604(c). The court entered an order on March 20, 2006, determining that

the government had satisfied each element of proof required under that section. This

finding was precipitated by the fact that defendant, even after a warning from this

court, failed to dispute the following fact asserted by the government: "Milburn Long

told Michael Barrett and Joyce Barrett that he (Milburn Long) would never allow

blacks to live at Park Place."[144]

---

[144] The court entered a Pretrial Order on February 17, 2006, setting the case for bench trial
on April 10, 2006. (*See* doc. no. 18 (Pretrial Order), at 7). The Pretrial Order instructed the
government's counsel to submit to defendant's counsel, by February 23, 2006, a statement setting
forth the principal facts proposed to be proved by the government in support of its claim as to
liability, civil penalties, and punitive damages. (*See id.* at 5-6). Defendant Long was ordered to
return the statement of proposed facts to plaintiff's counsel by March 2, 2006, indicating thereby
those factual contentions of the government with which he disagreed, and adding thereto those
additional facts proposed to be proved by him. (*See id.* at 6).

The government submitted its statement of proposed facts to defendant's counsel by the
court-ordered deadline. Among these proposed facts was fact number 88: "Milburn Long told

# PART FOUR

## *Remedies*

In sum, the court finds defendant Milburn Long liable under 42 U.S.C. § 3604(c) for the reasons discussed in the immediately preceding paragraph, and under §§ 3604(b) and (d) for discriminating against the following government testers on the basis of their race:  Francine Allen, Barry Briggs, Yolanda Hilliard, and Perry McCorkle.   In a civil action brought by the Attorney General to enforce the provisions of the Fair Housing Act, the court

> **(A)**  may award such preventive relief, including a permanent or temporary injunction, restraining order, or other order against the person responsible for a violation of this subchapter as is necessary to assure the full enjoyment of the rights granted by this subchapter;

> **(B)**  may award such other relief as the court deems appropriate, including monetary damages to persons aggrieved; and

---

Michael Barrett and Joyce Barrett that he (Milburn Long) would never allow blacks to live at Park Place." (Doc. no. 19, Ex. A, at proposed fact number 88).

Defendant's counsel, however, failed to return the statement of proposed facts to plaintiff's counsel by the March 2, 2006 deadline. (*See* doc. no. 19). This court then entered an order on March 14, 2006, instructing defendant's counsel to respond to the government's statement of proposed facts by the following day. (*See* doc. no. 22). Defendant's counsel did file a response the next day, but it did not address, let alone rebut, fact number 88. (*See* doc. no. 23).

Accordingly, and upon the government's motion, the court entered a pre-trial order on March 20, 2006, determining that the government had satisfied each element of proof required under 42 U.S.C. § 3604(c). (*See* doc. no. 25). That is, when Milburn Long purportedly "told Michael Barrett and Joyce Barrett that he (Milburn Long) would never allow blacks to live at Park Place," he (i) made a statement (ii) with respect to the rental of a dwelling (iii) indicating discrimination on the basis of race, or an intention to discriminate on the basis of race. *See* 42 U.S.C. § 3604(c); *see also, e.g., Hall v. Lowder Realty Company, Inc.*, 160 F. Supp. 2d 1299, 1320-21 (M.D. Ala. 2001) (Thompson, J.).

47

**(C)**  may, to vindicate the public interest, assess a civil penalty against the respondent —

**(i)**  in an amount not exceeding $5[5],000, for a first violation; and

**(ii)**  in an amount not exceeding $1[1]0,000, for any subsequent violation.

42 U.S.C. § 3614(d)(1)(A)-(C).  *See also* 28 C.F.R. § 85.3(b)(3) (increasing the civil penalty limit for a first offense from $50,000 to $55,000, and increasing the limit for any subsequent violation from $100,000 to $110,000).

**1**.  *Injunctive relief*

The government stated in its trial brief that it would seek injunctive relief against Milburn Long, but it did not specify the nature of the relief sought, saying it would provide the court with a proposed remedial order in the event it were to prevail at trial.[145]  Even so, this court notes that Long is no longer employed with Dawson Development,[146] and he is retired, living on social security benefits.[147]  An injunction against this defendant is unwarranted under the circumstances.

**2**.  *Compensatory damages*

The government may seek compensatory damages for the emotional distress

---

[145] *See* doc. no. 30 (United States' Trial Brief), at 21.

[146] *See* Trial Transcript, at 207.

[147] *See id.* at 124.

suffered by government testers, even where, as here, the testers have not intervened in the action.  *See United States v. Balistrieri*, 981 F.2d 916, 926-928, 930-33 (7th Cir. 1992).  *See also* 42 U.S.C. § 3614(d)(1)(B) (stating that, when the Attorney General brings a civil action to enforce the Fair Housing Act, "the court . . . may award such other relief as the court deems appropriate, including monetary damages to persons aggrieved"); *United States v. Rent America*, 734 F. Supp. 474, 482 (S.D. Fla. 1990) (the term "monetary damages" includes compensatory damages for emotional distress).  The government stated in its trial brief, however, that it would not seek compensatory damages on behalf of the government testers involved in this case.[148]  Accordingly, no compensatory damages will be awarded.

**3**.    *Punitive damages*

The Fair Housing Act does not specifically provide that punitive damages are an available remedy in actions brought by the Attorney General.  Even so, pursuant to 42 U.S.C. § 3614(d)(1)(B), a court "may award such other relief as the court deems appropriate, including monetary damages to persons aggrieved."  At least one court in this circuit has construed the words "monetary damages" to encompass an award of punitive damages.  *See Rent America*, 734 F. Supp. at 482.

---

[148] *See* doc. no. 30 (United States Trial Brief), at 2 n.2 ("Although the law permits the United States to seek compensatory damages on behalf of the African-American testers who inquired about renting a unit at Park Place, the United States has not generally asked for damages on behalf of testers, and does not intend to do so in this case.") (internal citations omitted).

"In fair housing cases, punitive damages are awarded to punish and deter outrageous conduct," and such damages are appropriate when the defendant acts "wantonly and willfully," or is motivated "by ill will, malice, or a desire to injure the plaintiffs." *City of Chicago v. Matchmaker Real Estate Sales Center, Inc.*, 982 F.2d 1086, 1099 (7th Cir. 1992) (citation omitted). *Cf. also Smith v. Wade*, 461 U.S. 30, 56 (1983) (stating that, under 42 U.S.C. § 1983, punitive damages are merited "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others").

Even so, this court understands that the government is seeking punitive damages, on behalf of Miesha, Sheneka, Rosemary, and Beverly Bothwell, but not on behalf of the government testers.[149]   Accordingly, and because the court has concluded that the government failed to establish Milburn Long's liability for the events related to the Bothwell family, an award of punitive damages is not appropriate.

**4**.   *Civil Penalties*

Finally, the government seeks a civil penalty against Milburn Long pursuant

---

[149] *See* Trial Transcript at 217.  At closing argument, the government's counsel said the United States is seeking "$20,000 in punitive damages for both Sheneka and Miesha Bothwell," and "$10,000 in punitive damages for Beverly and Rosemary Bothwell, the mothers."   *Id.*   The government did not mention the government testers in relation to punitive damages.

to 42 U.S.C. § 3614(d)(1)(C)(i).[150]  Under the Fair Housing Act, "[c]ivil penalties and punitive damages serve a common purpose:  to punish wrongdoing."  *United States v. Balistrieri*, 981 F.2d 916, 936 (7th Cir. 1992).  The disinction is that civil penalties are paid to the United States, while punitive damages are paid to individual plaintiffs.  *See id.*

Section 3614(d)(1)(C)(i), read in conjunction with 28 C.F.R. § 85.3(b)(3), provides that the district court "may, to vindicate the public interest, assess a civil penalty against the respondent . . . . in an amount not exceeding $5[5],000, for a first violation."[151]  In describing how the provision should be applied, the House Judiciary Committee stated that these civil penalties

> are maximum, not minimum, penalties, and are not automatic in every case.  When determining the amount of a penalty against a defendant the court should consider the nature and circumstances of the violation, the degree of culpability, any history of prior violations, the financial circumstances of that defendant and the goal of deterrence, and other matters as justice may require.

H.R. Rep. No. 100-711, at 40 (1988), *reprinted* in 1988 U.S.C.C.A.N. 2173, 2201.

*See also, e.g., Smith & Lee Associates, Inc. v. City of Taylor*, 102 F.3d 781, 798 (6th

---

[150] *See* doc. no. 30 (United States Trial Brief), at 20-21.  The government stated in its trial brief that it would seek civil penalties pursuant to § 3614(d)(1)(C)(i), but it did not specify the amount of the penalty sought, saying it would submit a specific request in a post-trial brief.  *See id.* At the conclusion of trial, however, this court advised the government that a post-trial brief would be unnecessary.  *See* Trial Transcript, at 220-21.

[151] It is undisputed that this action represents Milburn Long's first violation of the Fair Housing Act.

Cir. 1996) (applying the factors set forth in the House Report); *Walker v. Crawford*,

1999 WL 33921853, at *1-2 (N.D. Ohio Nov. 16, 1999) (same).

In application, courts have imposed the maximum statutory penalty under only

the most egregious circumstances. *See United States v. Shen*, 1997 WL 119494, at

*2 (9th Cir. March 11, 1997) (affirming the district court's decision to impose the

maximum civil penalty against a defendant on the basis of the district court's finding

that "'racial discrimination at Parthenia Terrace was egregious, deliberate, and carried

on for years in a deliberate plan"); *Walker*, 1999 WL 33921853, at *2-3 (assessing

a civil penalty of $40,000 against an individual defendant under the following

circumstances:  defendant's sexual harassment of women tenants "was repetitive and

long-standing"; the harassment was "purposeful and uninvited"; defendant's net

worth ranged between $202,000 and $753,000; defendant's testimony at trial "was

obviously perjurious", and his litigation tactics "abusive"; and, there was evidence

that defendant's illegal actions toward tenants continued even during the course of

litigation and trial); *United States v. Borough of Audubon, New Jersey*, 797 F. Supp.

353, 363 (D.N.J. 1991) (imposing a civil penalty of $10,000 against the city of

Audubon, New Jersey, where the discriminatory acts of city officials could be viewed

as an "aberration"); *United States v. Page Properties, Inc.*, 1999 WL 475563, at * 1

(8th Cir. July 6, 1999) (affirming district court's decision not to impose civil penalties

52

against an apartment manager; district court had found that such "penalties would do little to deter future discrimination in light of the expansive injunction" already imposed by the court).

In this case, the court finds that imposition of a civil penalty against Milburn Long is appropriate.   District courts should not tolerate the loathsome act of discriminating among citizens on the basis of race; and, absent the imposition of a civil penalty, there will be no punishment for defendant's wrongdoing in this case. A civil penalty also will serve the goal of deterrence.  It is true that Milburn Long is now retired and, therefore, a civil penalty may have little value in deterring this *specific* defendant.   Even so, a civil penalty will serve the purpose of *general* deterrence, by sending a message to other apartment owners and leasing agents that violation of the Fair Housing Act entails serious consequences.  *See Walker*, 1999 WL 33921853, at *2 (imposing a civil penalty for the purpose of general deterrence).

Other factors weigh against the imposition of a maximum penalty, however. There is no evidence that Milburn Long has ever before been sued, or found liable, for Fair Housing violations.   Additionally, Long's discrimination against the government testers occurred during a seven-month period in 2003.  This court cannot say that such discrimination was long-standing, or the fruit of a deliberate plan. *Contrast, e.g., Shen*, 1997 WL 119494, at *2 (maximum civil penalties warranted, in

53

part, by the fact that race discrimination was "carried on for years in a deliberate plan"). Moreover, Long now is retired and living on social security benefits. *Contrast Walker*, 1999 WL 33921853, at *2 (a $40,000 civil penalty against individual defendant was warranted, in part, by the fact that defendant's net worth ranged between $202,000 and $753,000).

In view of the foregoing, the court will impose a civil penalty of two thousand five hundred dollars ($2,500) for each proven violation of the Fair Housing Act. Because the government has established that Milburn Long (i) violated § 3604(c), and discriminated against (ii) Francine Allen, (iii) Barry Briggs, and (iv) Yolanda Hilliard and Perry McCorkle (posing as a couple), the *total* civil penalty imposed against Milburn Long will be ten thousand dollars ($10,000.00).

## PART FIVE

### Conclusion

An order of final judgment consistent with this memorandum opinion will be entered.

DONE this 16th day of August, 2006.

_____
United States District Judge

54